24CA1121 Peo v Newell 07-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1121
Jefferson County District Court No. 22CR3448
Honorable Diego G. Hunt, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jordan Newell,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE TOW
Harris and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 2, 2026

---

Philip J. Weiser, Attorney General, Emmy A. Langley, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chloe Sovinee-Dyroff, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jordan Newell, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree aggravated motor vehicle theft, criminal mischief ($1,000-$2,000), and reckless driving.  We affirm.

## I.    Background

¶ 2    The jury heard evidence that would support the following findings.

¶ 3    Newell stole an unattended vehicle from a driveway after the owners left it running with the keys inside.  The owners of the vehicle, Amanda Lujan and Daniel Abeyta, located the vehicle by using a tracking device that was attached to the keys.  They reported the stolen vehicle and its location to the police.  Police found the vehicle in a parking lot with Newell in the driver's seat.  Officers set up stop sticks and blocked the parking lot exits with patrol cars.  Officers then approached Newell with their guns drawn.  Newell attempted to drive away and hit one of the parked patrol cars.

¶ 4    Officers removed Newell from the vehicle, and once he was on the ground, one officer placed his knee on Newell's back to handcuff him.  Newell yelled that he "c[ould]n't breathe" and began seizing.

1

Newell managed to relay that he had taken fentanyl, and an officer administered Narcan. Paramedics transported Newell to the hospital, where he was intubated and remained hospitalized for four days.

¶ 5    Newell was released from the hospital and placed in the jail's medical observation unit. That same day, Investigator Timothy Clarkson and Investigator Michael Taplin from the Jefferson County Sheriff's Office (JCSO) conducted a custodial interrogation with Newell at the jail. Newell was sleeping on a bed in the unit when they entered. After waking him up, Investigator Clarkson read Newell his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and he agreed to speak to the investigators. During the interrogation, Newell admitted that he took the vehicle.

¶ 6    The prosecution charged Newell with first degree aggravated motor vehicle theft, criminal mischief, reckless driving, and tampering with physical evidence. A jury acquitted Newell of tampering but convicted him of all other charges. The court sentenced Newell to one year in the county jail's work release program and three years of probation.

## II. Suppression of Interrogation Statements

¶ 7 Newell argues the trial court erred by declining to suppress his statements from his custodial interrogation. We disagree.

### A. Additional Background

¶ 8 During the proceedings, Newell filed two motions to suppress. Newell's first motion requested that the court suppress all statements and evidence obtained in violation of section 24-31-902, C.R.S. 2025, which — in its present form — dictates when a Colorado peace officer must wear a body-worn camera. (As we discuss more fully below, the evolution of the language of this statute is significant in this appeal; thus, while we refer to section 24-31-902 generally as the body camera statute, to the extent particular legislative amendments are relevant to our discussion, we reference the specific bill number enacting the relevant change.) Newell argued that Investigators Clarkson and Taplin violated this statute when they failed to wear their body-worn cameras during his interrogation. Specifically, Newell argued that, like "many law enforcement agencies," the JCSO had adopted the use of body-worn cameras for certain of its officers (including Clarkson and Taplin) prior to the statute's effective date

3

of July 1, 2023, and, therefore, pursuant to section 24-31-902(3), the body camera statute "applied in full" to the covered JCSO officers beginning on July 1, 2022.

¶ 9    Newell's second motion contended that his statements were obtained without a valid waiver of his *Miranda* rights. He also argued that the statements were involuntary.

¶ 10    At an evidentiary hearing on the motions, Investigator Clarkson testified that Newell was sleeping in the back of the cell when he and Investigator Taplin arrived, but that Newell woke up after the door opened, and the investigators introduced themselves and asked if they could speak with him. Investigator Clarkson testified that he "read [Newell] his rights per *Miranda* off of the card the department gives us." He also testified that Newell "acknowledged that he understood his rights and that he agreed to talk to us without an attorney present." Investigator Clarkson admitted, however, that he failed to bring a *Miranda* waiver form, so Newell did not sign anything to indicate his waiver.

¶ 11    Investigator Clarkson described Newell as initially being groggy but confirmed that "he answered all the questions appropriately, and in a sensical way," that he "didn't appear confused at all," and

4

that he had no additional questions about his *Miranda* rights. Newell initially claimed that he received the stolen vehicle from a friend. But after Investigator Clarkson showed him pictures of the vehicle being stolen from the owners' driveway, Newell admitted that he took it.

¶ 12    Investigator Taplin testified that Investigator Clarkson advised Newell of his *Miranda* rights. He also testified that the tone of the interrogation was conversational, that Newell agreed to speak with them, that he did not appear to be experiencing any symptoms or conditions that may have impacted his ability to understand the officers, and that he never indicated that he no longer wished to speak to them. Investigator Taplin confirmed that Newell "changed his story after he saw [the] picture[s]."

¶ 13    Investigators Clarkson and Taplin testified that their department had issued body-worn cameras prior to Newell's arrest. But they testified that the department sent an internal instruction to "hold[] off on the use of this equipment" pending a department directive. Both investigators testified that they were not wearing their body-worn cameras during Newell's interrogation because of this instruction.

¶ 14    The court denied both motions to suppress the statements. Regarding the statutory claim, the court found that the body camera statute did not apply because the investigators "were not wearing their body cameras, as they were not required to do so . . . by the office . . . at the time." The court went on to note that, to the extent the statute did apply, "sufficient evidence has been presented to rebut any presumption of misconduct that the statute would require."

¶ 15    Regarding Newell's *Miranda* rights, the court found that his waiver "was made knowingly, intelligently, and voluntarily." In support of this conclusion, the court pointed to Newell's orientation to his surroundings, his coherent responses, his capacity to fabricate a story, his question about obtaining a personal recognizance (PR) bond, and his being medically cleared to be moved from the hospital to the jail's medical unit. The court also found for the same reasons that Newell's statements were voluntary and that there was no evidence of coercion on the part of the investigators.

## B.     Body Camera Statute

¶ 16     Newell contends that the trial court should have suppressed the statements he made during the police interrogation because they were obtained in violation of the body camera statute.

### 1.     Standard of Review and Applicable Law

¶ 17     "A lower court's ruling on a suppression motion presents a mixed question of fact and law." *People v. Tomaske*, 2019 CO 35, ¶ 7.  We defer to a trial court's findings of fact if they are supported by sufficient evidence in the record, but we review a lower court's conclusions of law de novo.  *Id.*  We similarly review issues of statutory interpretation de novo.  *McCoy v. People*, 2019 CO 44, ¶ 37.

¶ 18     "In construing a statute, our primary purpose is to ascertain and give effect to the legislature's intent." *Id.*  We determine legislative intent primarily from the plain language of the statute. *Romero v. People*, 179 P.3d 984, 986 (Colo. 2007).  We give words and phrases their plain and ordinary meaning.  *McCoy*, ¶ 37.  We also "read statutory words and phrases in context, and we construe them according to the rules of grammar and common usage."  *Id.* We read the statute as a whole, "giving consistent, harmonious, and

7

sensible effect to all of its parts, and we must avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results." *Id.* at ¶ 38. "If the statutory language is clear and unambiguous, we do not engage in further statutory analysis." *Romero*, 179 P.3d at 986. "However, if the statutory language is ambiguous, we may look to other rules of statutory construction or to the legislative history to discern the legislature's intent." *Id.*

¶ 19     As presently enacted, the body camera statute provides that "a peace officer shall wear and activate a body-worn camera . . . during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law." § 24-31-902(1)(a)(II)(A). A peace officer's failure to activate their body-worn camera per the statutory requirements will result in "a permissive inference in any investigation or legal proceeding . . . that the missing footage would have reflected misconduct by the peace officer." § 24-31-902(1)(a)(III). Failure to comply also creates a rebuttable presumption of inadmissibility for "any statements or conduct sought to be introduced in a

prosecution through the peace officer related to the incident that were not recorded due to the peace officer's failure to activate . . . the body-worn camera." *Id.*

### 2.    Statutory History

¶ 20    In 2020, the General Assembly passed S.B. 20-217, enacting the body camera statute.  Ch. 110, sec. 2, § 24-31-902, 2020 Colo. Sess. Laws 446.  The statute was aimed at enhancing law enforcement integrity amid concerns of police brutality.  2d Reading on S.B. 20-217 before the S., 72d Gen. Assemb., 2d Reg. Sess. (June 8, 2020).  S.B. 20-217 required that "[b]y July 1, 2023, all local law enforcement agencies in the state . . . shall provide body-worn cameras for each peace officer of the law enforcement agency."  2020 Colo. Sess. Laws at 446.

¶ 21    Following the passage of S.B. 20-217, law enforcement agencies expressed confusion regarding the effective dates for the various sections.  *See* Hearing on H.B. 21-1250 before the S. State, Veterans & Mil. Affairs Comm., 73d Gen. Assemb., 1st Reg. Sess. (May 25, 2021).  In 2021, the General Assembly addressed these concerns with the passage of H.B. 21-1250.  Ch. 458, sec. 2, § 24-31-902, 2021 Colo. Sess. Laws 3055.  H.B. 21-1250 added

9

language to the body camera statute clarifying that the body camera statute "does not require a law enforcement agency to provide its law enforcement officers with body-worn cameras prior to July 1, 2023." 2021 Colo. Sess. Laws at 3058. However, the new section also provided, as discussed below, that "[i]f a peace officer is wearing a body-worn camera . . . the remaining portions of [the body camera statute] apply on and after July 1, 2022." *Id.*

### 3.    Analysis

¶ 22    The crux of the issue in this case is whether the body camera statute obligated the investigators to wear the body-worn cameras their department had issued to them prior to the statute's effective date. Newell argues the language of the body camera statute is ambiguous. Specifically, he contends that "the plain language of subsection (1)(a)(II) and subsection (3) leads to absurd illogical results" because when read together they require that "an officer must wear a [body-worn camera] by July 1, 2022, if the officer is wearing a [body-worn camera]." The People argue that the statutory language is not ambiguous as "it states that officers are required to use a body-camera when a peace officer is wearing a body-worn camera," and that "the requirement does not turn on whether or not

10

an officer previously had a body-camera." We agree with the People.

¶ 23    Subsection (3) explicitly states that the remaining portions of the body camera statute apply on or after July 1, 2022, "[i]f a peace officer is *wearing* a body-worn camera." § 24-31-902(3) (emphasis added). Put another way, as of July 1, 2022, peace officers were required to activate their body-worn cameras pursuant to the circumstances described in subsection (1)(a)(II)(A), *on the condition that* the peace officer was wearing one. *See* Merriam-Webster Dictionary, https://perma.cc/FS8S-8SNW (defining "if" as "on condition that"). Meanwhile, subsection (1)(a)(I) states that law enforcement agencies "*shall* provide body-worn cameras" by July 1, 2023. § 24-31-902(1)(a)(I) (emphasis added); *see also People v. Garcia*, 2016 COA 124, ¶ 13 ("'[S]hall' is generally mandatory."). In other words, prior to July 1, 2023, a peace officer was required to activate a body-worn camera *only if they were wearing* one. Then, starting July 1, 2023, peace officers were required to both wear and activate the camera when engaging in any conduct described in subsection (1)(a)(II)(A).

¶ 24     Investigators Clarkson and Taplin interrogated Newell on December 20, 2022.  Because the interrogation occurred before July 1, 2023, the investigators were only required to activate their body-worn cameras if they were wearing them.  It is undisputed that the investigators were not wearing body-worn cameras at the time they interrogated Newell.  Therefore, provisions of the body camera statute are inapplicable, and Newell is entitled to neither a permissive inference of misconduct on the part of the investigators nor a rebuttable presumption of inadmissibility for the statements made.

### C.    *Miranda* Waiver

¶ 25     Newell next argues that his *Miranda* waiver was not knowing, intelligent, or voluntary.  Newell also argues the ensuing statements were involuntary.  Accordingly, he contends, the trial court should have suppressed his statements.  We disagree.

### 1.    Standard of Review and Applicable Law

¶ 26     As noted, when reviewing a suppression motion ruling, we defer to a trial court's findings of fact but review its legal conclusions de novo.  *Tomaske*, ¶ 7.  And the validity of a *Miranda* waiver and the voluntariness of a defendant's statements are legal

12

questions that we review de novo.  *People v. Smiley*, 2023 CO 36,

¶ 12; *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010).  But we

defer to the trial court's findings of fact that underpin those

ultimate determinations so long as the findings are supported by

competent evidence in the record.  *See People v. Humphrey*, 132

P.3d 352, 356 (Colo. 2006); *People v. Hutton*, 831 P.2d 486, 488

(Colo. 1992).

¶ 27    A defendant has a constitutional right to not be compelled to

be a witness against themself in any criminal case.  *See* U.S. Const.

amend. V; Colo. Const. art. II, § 18.  This right applies during

custodial interrogation.  *Miranda*, 384 U.S. at 444.  To protect this

right, law enforcement agents are required to adhere to certain

guidelines during a custodial interrogation.  *Id.*  A suspect may

waive these *Miranda* protections provided the waiver is "made

voluntarily, knowingly, and intelligently under the totality of the

circumstances."  *People v. Torres*, 2026 CO 15, ¶ 34.

¶ 28    Newell does not challenge the voluntariness of his *Miranda*

waiver.  Consequently, we focus our consideration of Newell's

waiver (as opposed to his statements) on whether it was knowing

and intelligent.  *See People v. Knedler*, 2014 CO 28, ¶ 11.  A

*Miranda* waiver is knowing and intelligent if "it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Smiley*, ¶ 16 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A defendant need only minimally understand their rights to knowingly and intelligently waive them. *See People v. Al-Yousif*, 49 P.3d 1165, 1172 (Colo. 2002). We consider the totality of the circumstances when evaluating whether a *Miranda* waiver was knowing and intelligent, including such factors as (1) the length of time between the initial *Miranda* advisement and the interrogation; (2) whether the defendant or the interrogating officer initiated the interview; (3) whether and to what extent the interrogating officer reminded the defendant of their rights before the interrogation; (4) the clarity and form of the defendant's acknowledgment and waiver; (5) the defendant's background and experience with the criminal justice system; (6) any language barriers; and (7) the defendant's age, experience, education, background, and intelligence. *Knedler*, ¶ 13.

¶ 29 Regardless of whether a *Miranda* waiver is valid, the defendant's statements must be suppressed if those statements are involuntary. *People v. Zadran*, 2013 CO 69M, ¶ 9. The

voluntariness doctrine requires a two-step inquiry. *People v. Ramadon*, 2013 CO 68, ¶ 20. First, we must ask whether the police conduct was coercive. *Id.* Second, if we find it was coercive, we must then determine whether the coercive police conduct played a significant role in inducing the statements. *Id.* The court must again consider the totality of the circumstances when assessing the voluntariness of a defendant's statements. *Id.* The court may consider factors such as (1) whether the defendant was in custody or free to leave; (2) whether the defendant was aware of the situation and understood and waived their *Miranda* rights; (3) whether the defendant had the opportunity to confer with counsel prior to the interrogation; and (4) the physical conditions of the location where the interrogation occurred. *See id.*

2.    Analysis

a.    Knowing and Intelligent Waiver

¶ 30    Newell argues that his *Miranda* waiver was not knowing and intelligent because (1) the investigators initiated the interview; (2) his acknowledgment and waiver lacked clarity; (3) he had limited experience with the criminal justice system; and (4) he was young.

15

¶ 31  The court found, based on the investigators' testimony, that (1) Newell was "oriented to his surroundings and situation"; (2) "he was coherent and his responses to the questions asked were logical and tracked"; and (3) "there was no indication to [the investigators] other than Mr. Newell being in the [medical unit] that there were any medical issues or that Mr. Newell was somehow incoherent." The court also noted that while the investigators described Newell as being "tired," he was able to answer questions coherently, logically, and rationally.  Finally, the court noted that Newell possessed the capacity to fabricate a story and had the "presence of mind to ask whether or not law enforcement could help [him] obtain a PR bond."  These findings have record support, and we therefore defer to them.  *Humphrey*, 132 P.3d at 356.

¶ 32  Newell correctly asserts that the investigators initiated the conversation, but his other contentions are unpersuasive.  Newell's acknowledgment and waiver was clear.  Both investigators testified that Newell "agreed to speak with [them]," and while they could not recall the exchange verbatim, they indicated that Newell asked no questions about his *Miranda* rights and did not attempt to end the conversation at any point.  Moreover, he had enough experience

with the criminal justice system to ask if the investigators would be able to assist him in getting a PR bond.

¶ 33    Reviewing all the circumstances, we conclude that Newell knowingly and intelligently waived his rights. *See Al-Yousif*, 49 P.3d at 1172.

b.    Voluntary Statements

¶ 34    Newell next argues that his statements were involuntary because (1) he was in custody and not free to leave; (2) it is not clear from the evidence that Newell was advised of, understood, and waived his *Miranda* rights; (3) he did not have the opportunity to confer with anyone before the interrogation; (4) his statements were made during the interrogation and not volunteered; and (5) he was in a weakened state before and during the interrogation.

¶ 35    Significantly, Newell does not explicitly assert that the officers coerced his statements during the interrogation. Nor does he direct us to any specific evidence that would establish such coercion. Thus, Newell's challenge arguably fails to clear the first hurdle and our inquiry could end. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . .").

However, we note that the People also fail to explicitly address whether the police conduct was coercive, instead (taking Newell's lead) focusing on whether Newell's statements were voluntary notwithstanding the fact that he was ill, in custody, subject to interrogation, and naive about the justice system.

¶ 36    But even if we were to broadly read Newell's challenge to encompass a claim of coercive police conduct, we would reject it.

¶ 37    During the suppression hearing, the court found that the investigators introduced themselves before questioning Newell, that their tone was conversational, and that "there was no evidence of any threats, promises, or coercion on the part of law enforcement to elicit any of the statements that the defendant may have made." The court then reiterated its findings regarding Newell's general demeanor and coherency throughout the interrogation.  Once again, we defer to the trial court's factual findings, as they have record support.  *Hutton,* 831 P.2d at 488.

¶ 38    We agree that Newell was in custody and not free to leave.  We also agree that Newell's statements were made in response to questions as opposed to being volunteered and that he did not have

the opportunity to confer with anyone prior to the interrogation. But we find that his remaining assertions are belied by the record.

¶ 39 First, as noted above, Newell was advised of his *Miranda* rights, understood them, and waived them.

¶ 40 Second, we disagree with Newell's assertion that the evidence demonstrates that he was in a weakened state. The court must consider a "defendant's mental and physical condition just prior to the interrogation." *Ramadon*, ¶ 20. Here, the evidence shows that Newell was sleeping prior to the interrogation and that he appeared to be "tired" and "slightly groggy." But he was coherent throughout the entire conversation. Moreover, he was healthy enough to be released from the hospital to the jail's medical unit.

¶ 41 In short, based on the trial court's factual findings, we discern nothing to suggest that Newell's statements were the product of police coercion. *See id.*

### III. Prosecutorial Misconduct

¶ 42 Newell next argues that prosecutorial misconduct deprived him of a fair trial. We disagree.

19

### A. Applicable Law and Standard of Review

¶ 43　We apply a two-step analysis to prosecutorial misconduct claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we must determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we must determine if any improper conduct warrants reversal according to the proper standard. *Id.*

¶ 44　A prosecutor has wide latitude to make arguments based on facts in evidence, *People v. Maloy*, 2020 COA 71, ¶ 61, and in responding to arguments made by defense counsel, *People v. Cuellar*, 2023 COA 20, ¶ 71. However, this power is not limitless. *Id.* For example, a prosecutor may not characterize the defense's theory in a way that improperly denigrates defense counsel. *Id.*

### B. Denigration of Defense

¶ 45　Newell contends that three statements from the prosecutor improperly denigrated defense counsel and mischaracterized the theory of defense. The statements were:

- "[D]efense yesterday in their opening statement said 'Mr. Newell had to think fast[.]' Mr. Newell had to think fast because of what he did."

20

- "[Defense counsel] wants you to believe here today that law enforcement should not have contacted [Newell] the way they did. They should not be doing their job. They should not be enforcing laws. Mr. Newell should have been allowed to keep that vehicle that day."

- "When we talk about using our common sense and why there's an instruction of not appealing to sympathy, [defense counsel] is asking you to consider evidence that doesn't go to the elements. That's sympathy."

We discern no error in the first or third statements and conclude that, while the second statement was improper, it does not warrant reversal.

### 1. Fair Comments on the Evidence and Defense

¶ 46 Because our assessment of the first and third statements is the same, we address them together.

¶ 47 Throughout her opening statement, defense counsel emphasized the quick succession of events in the parking lot. She said that Newell "did not have time to think that day" and that Newell's decision to flee and subsequent collision with the patrol car happened "in a matter of seconds." And she made other similar

statements regarding the rapid-fire nature of the events. Defense counsel emphasized the manner in which officers approached Newell in the parking lot. She described how the officers approached the car window with "their firearms out," and that one officer "started running toward[] Mr. Newell screaming; importantly, never announcing himself; pointing the gun directly in the window of that car . . . , and ultimately butting that gun up against the window." Defense counsel's main theory — that Newell did not have time to think — relied in part on the manner in which officers approached the vehicle because it prompted Newell to react on instinct and attempt to flee.

¶ 48    The prosecutor then summarized these arguments and responded to them by stating that Newell "had to think fast," and that he had to do so "because of what he did." Rather than denigrating the defense, the prosecutor's statements were a fair response to the defense's theory of the case. *See People v. Samson,* 2012 COA 167, ¶ 37 (finding no prosecutorial misconduct where the challenged statements were fair comments on the defendant's theory of the case). Thus, we cannot say that the prosecutor's

22

summarization of defense's opening statement in this manner was improper. *Wend*, 235 P.3d at 1096.

¶ 49 In her closing argument, defense counsel stated that the police officers "saw a very scared Mr. Newell with his hands already in the air," after he crashed the vehicle. Defense counsel then addressed Newell's state of mind in the immediate aftermath of the crash by stating that "[h]e was scared [and] [h]e was seizing."

¶ 50 During rebuttal closing, the prosecutor addressed these statements by reminding the jurors that they could not make a decision based on sympathy, rather, they must consider evidence only as it goes to the elements. And while, in the heat of trial, the prosecutor inartfully limited the jurors' consideration to "only . . . the elements," it was in the context of reminding them — correctly — that their verdict could not be based on sympathy. Thus we do not consider this statement to be misconduct. *See Samson,* ¶ 30 ("[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful.").

## 2. Improper Characterization

¶ 51    As to the second statement, however, we agree with Newell that the prosecutor's characterization of Newell's argument as suggesting that the police should not be doing their job and that Newell should have been allowed to keep the stolen car improperly mischaracterized the defense and was unduly pejorative.  An assertion that the police acted too aggressively for the circumstances is not tantamount to an argument that they should not have acted at all.  And the suggestion that Newell was asserting that he should have been allowed to keep the car patently twisted Newell's theory of defense.  However wide the latitude a prosecutor may have in crafting a closing argument, it is not so expansive as to permit such *reductio ad absurdum* fallacies.

¶ 52    That being said, and even assuming Newell adequately preserved his challenge to this statement, we discern no basis for reversal.

¶ 53    First, we reject Newell's contention that we should review this issue for constitutional harmlessness.  "Although any prosecutorial error can implicitly affect a defendant's right to a fair trial," constitutional harmless error review is limited to errors that

24

"specifically and directly offend a defendant's constitutional rights" such as impermissibly commenting on a defendant's exercise of [their]right not to testify, [their] right to be tried by a jury, or [their] right to post-arrest silence. *Wend*, 235 P.3d at 1097. Claims of improper denigration of the defense do not directly impact a defendant's constitutional rights and are thus reviewed for harmless error. *Cuellar*, ¶¶ 80-81.

¶ 54 We agree with the People that the error was harmless. The jury viewed a video of the police encounter and could make an independent assessment of the propriety of the police conduct and its potential impact on Newell's actions. The investigators also explained to the jury the reasons for their actions. And the evidence of both Newell's theft of the vehicle and his intentionally driving it into the police car was overwhelming. Reviewing the entirety of the evidence, we conclude there is no reasonable probability that the error contributed to Newell's conviction. *See Washington v. People*, 2024 CO 26, ¶ 25 (defining harmless error (citing *Crider v. People*, 186 P.3d 39, 42 (Colo. 2008))).

## C.    Value of Property Damaged

¶ 55    Newell next contends that the prosecutor committed misconduct when she argued that the jury could consider damages to the stolen vehicle (as opposed to just the police car) as part of the criminal mischief charge.

### 1.    Additional Background

¶ 56    In the original criminal mischief charge, the prosecution alleged that Newell "damaged the real or personal property of Jefferson County, the aggregate damage being two thousand dollars or more but less than five thousand dollars." The prosecution later amended that charge to add Lujan and Abeyta as victims. However, during trial, in response to Newell's motion for judgment of acquittal, the trial court found that the prosecution had presented no evidence regarding the amount of damages to the stolen vehicle. Accordingly, the court ruled that the prosecution "would not be able to move forward with the criminal mischief count where the aggregate damage is in excess of $2,000 given the failure of proof as to that element."

¶ 57    During closing argument, when addressing the criminal mischief charge, the prosecutor stated that the jury was "allowed to

look at the aggregate value of the damage caused by Mr. Newell on December 16th of 2022," and that the jury had "the evidence, both from the JCSO mechanic that told you how much it cost to repair that patrol vehicle, and then you also do get to see the damage to Ms. Lujan's vehicle." Defense counsel objected "based on earlier rulings," which the court overruled.

¶ 58 The jury found that the damage caused was between $1,000 and $2,000.

## 2. Analysis

¶ 59 We are skeptical that the prosecutor committed misconduct, as she never argued to the jury that the damages totaled more than $2,000. Moreover, it is not clear that the prosecutor acted in bad faith or violated the trial court's prior order, especially given that the elemental jury instruction on the criminal mischief charge included a reference to damage to Lujan and Abeyta's vehicle (and Newell did not request that reference be eliminated).

¶ 60 But we need not decide whether the prosecutor's comments were improper because even assuming they were, any misconduct was harmless. The prosecution presented evidence that Newell drove the stolen vehicle into a parked patrol car and that the patrol

car sustained $1,832.12 worth of damages. The jury in turn found Newell guilty of criminal mischief with the total value of property damage falling between $1,000-$2,000. We thus cannot say that there is any probability that the prosecutor's argument related to the damage to the stolen vehicle contributed to Newell's conviction. *See Washington,* ¶ 25.

## IV.  Disposition

¶ 61     The judgment is affirmed.

JUDGE HARRIS and JUDGE BROWN concur.